PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVY GENE STEPHENS,

*Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North Carolina,

*Respondent-Appellee.*

No. 08-14

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:06-hc-02097-BO)

Argued: May 13, 2009

Decided: June 30, 2009

Before KING, SHEDD, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Shedd and Judge Agee joined.

## COUNSEL

**ARGUED:** Jonathan Lee Megerian, MEGERIAN & WELLS, Asheboro, North Carolina, for Appellant. Steven Franklin Bryant, NORTH CAROLINA DEPARTMENT OF JUSTICE,

Raleigh, North Carolina, for Appellee. **ON BRIEF**: Paul M. Green, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

## OPINION

KING, Circuit Judge:

Davy Gene Stephens appeals from the district court's dismissal of his 28 U.S.C. § 2254 petition for a writ of habeas corpus, which challenges his three North Carolina murder convictions and death sentences, as well as three related felony convictions and sentences. Although it denied habeas corpus relief, the district court awarded a certificate of appealability (the "COA") on Stephens's claim that the conflicting interests of his trial counsel contravened his Sixth Amendment right to effective representation. As explained below, we affirm.

I.

A.

In February and March of 1995, Stephens was indicted in the Superior Court of Johnston County, North Carolina — a county of about 160,000 immediately southeast of Raleigh — on three counts of first-degree murder and three counts of felony assault, all arising from what was called the "Grill Road triple homicide." Stephens was tried capitally and found guilty of all charges in November 1995, and, following a capital sentencing proceeding, the jury recommended a death sentence for each murder conviction. On December 20, 1995, the trial court imposed sentence: for the three felony assault convictions, 88 to 124 months imprisonment; for each murder conviction, death.

On direct appeal, the Supreme Court of North Carolina summarized the underlying facts of the case as follows:

At trial, the State presented evidence tending to show that on the evening of 20 January 1995, defendant and his accomplice, William Barrow, had dinner together and shared a bottle of Everclear and some whisky. The following morning, at approximately 2:00 a.m., defendant and Barrow drove to the Johnston County Grill Road home of Lynn Wright, a reputed drug dealer. Upon arrival, defendant and Barrow went straight to Wright's bedroom and shot him six times, killing him. Defendant and Barrow then separated in the house, and Barrow walked onto the porch and shot Antwon Jenkins in the head, killing him. Barrow then attempted to kill James White, but the bullet only grazed the side of White's face. Defendant entered the living room and attempted to shoot eighty-three-year-old Kenneth Farmer in the head, but the shot only hit Farmer in the arm as he threw his hand up. Defendant next tried to shoot John Wright but apparently ran out of bullets. Defendant and Barrow then left the Grill Road home but returned shortly thereafter. At this time, defendant shot and killed Michael Kent Jones, and Barrow seriously injured June Bates with gunshot wounds to her back and arm. Bates escaped and called for help from a nearby house.

When deputies arrived at the Grill Road home on 21 January 1995, they found a black man lying on the porch, dying from gunshot wounds to his head. The officers found four fired cartridge cases, caliber 38 Special, in a water basin in the front room. In the first bedroom, the officers found another black man, Lynn Wright, lying on the floor surrounded by blood and crack cocaine. Behind the house, the officers found another victim, Kenneth Farmer, who had

been shot in the left arm. Farmer was able to identify one of the shooters as defendant Davy Stephens because Stephens had been to the house on several previous occasions. Farmer later picked Stephens out of a police photographic lineup. Following a lead, officers found defendant hiding in the attic of a house occupied by his girlfriend, and he was apprehended. The officers also found a 38 Special revolver near defendant in the attic.

The State offered testimony from three medical examiners who concluded that Lynn Wright, Antwon Jenkins and Michael Kent Jones all died of gunshot wounds. Special Agent Eugene Bishop gave a ballistic report on the 38 Special revolver found with the defendant at the time of his arrest and determined that four cartridge casings found in the water basin at the Grill Road house were fired by this 38 Special. Bishop also tested a bullet found in the clothes of June Bates and concluded this bullet bore rifling characteristics similar to a 357 Magnum.

*State v. Stephens*, 493 S.E.2d 435, 438-39 (N.C. 1997). The state supreme court affirmed Stephens's convictions and sentences on direct appeal, *see id.* at 447, and the Supreme Court of the United States denied certiorari, *see Stephens v. North Carolina*, 525 U.S. 831 (1998).

### B.

#### 1.

On April 13, 1999, Stephens's state-appointed post-conviction attorneys filed a Motion for Appropriate Relief (the "First MAR") in the Superior Court of Johnston County (the "MAR court"). *See* N.C. Gen. Stat. § 15A-1411. In the First MAR, Stephens asserted, inter alia, that he had received ineffective assistance of counsel because one of his court-

appointed trial attorneys, W.A. "Andy" Holland, Jr., was at the same time also representing the Sheriff of Johnston County. The First MAR alleged that Holland had an "obvious conflict of interest" because he was concurrently representing "the very law enforcement agency that gathered the evidence and was otherwise instrumental in prosecuting [Stephens]." J.A. 426.[1] It was asserted that this conflict of interest adversely affected Holland's trial performance because Holland "failed to cross-examine deputies about prior surveillance and did not emphasize the failure of the Johnston County Sheriff's Department to close the crack house down." *Id.* at 428. The First MAR faulted Holland for not putting "the entire Sheriff's Department on trial," apparently on the theory that Stephens could not have shot the victims if the Sheriff's Office had first arrested them. *Id.* Finally, the First MAR alleged that the trial court failed to properly investigate Holland's conflict of interest after being alerted to it by the prosecution. According to the conflict claim, the trial court neither questioned Holland about the conflict nor confirmed Stephens's understanding of the situation. Indeed, the First MAR asserted that "any waiver of the conflict of interest was not made knowingly, intelligently [or] voluntarily." *Id.* at 429.

On May 2, 2001, the MAR court dismissed the First MAR and declined to conduct an evidentiary hearing on any of Stephens's claims. *See State v. Stephens*, No. 95 CRS 787-791, 2855 (N.C. Super. Ct. May 2, 2001) (the "First MAR Order").[2] On Holland's alleged conflict of interest, the court concluded that Stephens was procedurally barred from raising the issue because he was previously in a position to pursue it in his direct appeal to the Supreme Court of North Carolina. *See* N.C. Gen. Stat. § 15A-1419(a)(3) (calling for denial of a motion for appropriate relief when "[u]pon a previous appeal the defendant was in a position to adequately raise the ground

---

[1]Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

[2]The First MAR Order is found at J.A. 529-65.

or issue underlying the present motion by did not do so").[3] Further, the MAR court ruled that the conflict of interest claim was without merit because of the following:

> Mr. W. A. "Andy["] Holland was appointed to represent Stephens at trial. As shown by the record and "Memorandum of Understanding", signed by Stephens and contained in the file, Mr. Holland represented the Sheriff of Johnston County in connection with an Equal Employment Opportunity Commission [("EEOC")] complaint.[4]

> First, Stephens has failed to show that an actual conflict of interest existed. Mr. Holland's representa-

---

[3]Section 15A-1419(b) of the General Statutes of North Carolina authorizes exemptions to the procedural bar of section (a) if the defendant can show "good cause" and "actual prejudice resulting from [his] claim," or that "failure to consider [his] claim will result in a fundamental miscarriage of justice." The MAR court ruled that neither of these exemptions applied to Stephens's conflict claim.

[4]The "Memorandum of Understanding" is dated November 15, 1995; Stephens's trial began on November 27, 1995. The complete Memorandum is as follows:

> Davy Stephens, hereby acknowledges in writing that he has had an open discussion with W. A. Holland, Jr., concerning Mr. Holland's representation of the Sheriff of Johnston County in connection with Equal Employment Opportunity Commission complaint. Davy Stephens further acknowledges that after this full disclosure that he is satisfied with the services of W. A. Holland, Jr., as his attorney. Davy Stephens further acknowledges in writing that he is fully satisfied with the disclosure of Mr. Holland's involvement with the EEOC complaint against the Sheriff's Department, and fully accepts Mr. Holland's statements to him, that such representation will in no way limit or diminish Mr. Holland's cross examination of any investigating officer from the Sheriff's Department, nor will it in any way affect his zealous representation of Mr. Stephens in his pending cases wherein he is charged with First Degree Murder, and the District Attorney has announced that he intends to seek the death penalty.

J.A. 636.

tion of the Sheriff of Johnston County in an EEOC complaint had no connection whatsoever with Mr. Holland's representation of Stephens in his criminal case. . . .

Secondly, even assuming *arguendo* that an actual conflict of interest existed, Stephens has failed to establish that such conflict of interest adversely affected Mr. Holland's performance at any time during Stephens' trial. The record does not demonstrate that Mr. Holland's representation of the Sheriff of Johnston County in connection with an EEOC complaint induced Mr. Holland to compromise his zealous representation of Stephens in any way. In fact, a review of the record confirms that Mr. Holland zealously defended Stephens and pursued all available defenses and trial strategies which were of help to Stephens. Mr. Holland vigorously cross-examined sheriff's deputies, questioning at every turn their actions, identification techniques and investigatory methods. . . .

Review of the record in this case shows that Mr. Holland's representation of the Sheriff of Johnston County in an EEOC complaint was brought to the trial court's attention before Stephens' trial started. This issue was discussed in court [on November 27, 1995, the first day of trial] by the trial court, counsel for the State, Stephens' trial counsel, and Stephens himself. The trial court reviewed the "Memorandum of Understanding" with counsel and Stephens. Stephens indicated that the "Memorandum of Understanding" was correct in all respects, acknowledged his signature on the "Memorandum of Understanding", indicated he was satisfied with the understanding of Mr. Holland's representation of the sheriff with regards to the EEOC complaint, and did not want to add or say anything in regard to this matter.

> The trial court made an adequate inquiry into the alleged conflict of interest [and concluded that Stephens waived any conflict that might be found to have existed].

First MAR Order 12-14 (citations omitted). Stephens subsequently filed a petition for certiorari with the state supreme court, but it was denied. *See State v. Stephens*, 559 S.E.2d 550 (N.C. 2001).

2.

After receiving a final ruling on the First MAR, Stephens secured new representation for federal habeas corpus proceedings. Because his new lawyers believed that the First MAR was denied because of procedural oversights — as opposed to lack of merit — they filed a second MAR in the Superior Court of Johnston County on May 20, 2002 (the "Second MAR"). The Second MAR asserted that the inexperience of Stephens's initial post-conviction counsel rendered him unable to effectively raise his claims, thus providing good cause to bypass the procedural bar established by section 15A-1419(a)(3) of the General Statutes of North Carolina. The Second MAR further asserted that Stephens was not in a position to raise the conflict claim in the First MAR because his trial attorneys, Cynthia Huntsberry and Holland, had refused to cooperate with his initial post-conviction lawyers.[5]

On February 14, 2003, Stephens filed an amendment to the Second MAR (the "MAR Amendment"). The MAR Amend-

---

[5]The Second MAR alleged that Huntsberry, the lead trial counsel, failed to comply with section 15A-1415(f) of the General Statutes of North Carolina, which requires that "the defendant's prior trial or appellate counsel . . . make available to the capital defendant's counsel their complete files relating to the case of the defendant." Indeed, Huntsberry did not produce her files on Stephens's case until the morning of the merits hearing on the First MAR, having ultimately been served with a subpoena duces tecum for those files.

ment set forth additional grounds for relief, including a revised version of the conflict of interest claim. In this expanded conflict claim, Stephens alleged that Holland's attorney-client relationship with the County was much more extensive than previously described. In support of the conflict claim, the MAR Amendment describes the following new discoveries:

- "Holland actively represented the Johnston County Tax Collector and the Johnston County Department of Social Services with respect to its interests adverse to capital defendant Angel Guevara, at and around the time of defendant Davy Stephens' [November 1995] trial." J.A. 624. Guevara was later convicted and sentenced to death, in May 1996, for the September 1995 murder of Johnston County Sheriff's Deputy Paul West, who had been one of the first two officers to arrive at the scene of the Grill Road triple homicide.

- A newspaper article about the Guevara case refers to "Johnston County attorney Andy Holland." *Id.* at 655.

- During Stephens's trial, Holland presented an order related to the Guevara case to a Senior Resident Judge who was not affiliated with the Stephens case. The order contained factual inaccuracies that resulted in Holland being censured and fined $500.

- In a February 5, 2003 telephone conversation with Stephens's new post-conviction attorneys, Holland admitted that "around the time of defendant Stephens' trial, he [Holland] was under contract to provide legal services and advice to the Johnston County Commissioners, the Department

of Social Services (including child support mat-ters), the Tax Office and the Sheriff." *Id.* at 625. Holland further admitted "that he was the only attorney providing such services at the time, and that he was the 'County Attorney' in every way but in name." *Id.*

The MAR Amendment went on to assert that Holland's con-tract with the County placed him in an ongoing attorney-client relationship with the Sheriff's Office, thus warranting an evi-dentiary hearing or leave to conduct further discovery on the conflict claim. Though the MAR court summarily dismissed all of Stephens's other claims, it granted an evidentiary hear-ing on the conflict claim.

At an evidentiary hearing conducted on December 6, 2004, the Sheriff's Office produced documents, in response to a subpoena, concerning the EEOC complaint on which Holland had represented the Sheriff's Office around the time of Ste-phens's trial. These documents revealed the following about the EEOC matter:

- In July 1995, Wilma Jean Edwards, a Sheriff's Office employee, filed a sex discrimination claim with the EEOC for failure to promote. After her September 1995 termination, she also filed a retaliatory discharge claim.

- Holland's response to the retaliatory discharge claim, prepared on behalf of the Sheriff's Office, asserted that Edwards had come under suspicion in August 1995 as a source of leaks in the Coun-ty's Drug Task Force. A State Bureau of Investi-gation inquiry was underway.

- On November 5, 2005 — twenty-two days before Stephens's trial began — Holland prepared a let-ter to the EEOC on behalf of the Sheriff's Office.

The letter recounts the Office's discovery that Edwards had been deleting computer files related to the Drug Task Force, including felony investigation reports and search warrants related to ongoing investigations. The letter does not, however, discuss the nature of those ongoing investigations.

- A report of a September 26, 1995 meeting, which was prepared by Chief Deputy Smith, described the destroyed files as "related to active homicide investigations." J.A. 1149.

- An appeals decision from the Employment Security Commission (the "ESC") of North Carolina pertaining to the Edwards matter, which was mailed on December 1, 1995, described the deleted files as "includ[ing] a triple homicide case." *Id.* at 1150.

During the evidentiary hearing, Holland testified that he relied on Smith's report in drafting his November 5, 1995 letter to the EEOC, and he confirmed that the Stephens case was the only triple homicide in Johnston County in the 1990s. He denied, however, that he had seen the December 1, 1995 ESC document before the evidentiary hearing. He went on to explicitly deny that he had knowledge of Edwards deleting files that were relevant to the Stephens case.[6]

---

[6]The record indicates that, prior to the evidentiary hearing, Holland was less than forthcoming regarding the extent of his representation of the County and, more particularly, the Sheriff's Office. For example, in a March 20, 2000 letter responding to a request made by Stephens's initial post-conviction counsel for further information, Holland failed to provide details of the EEOC matter and asserted that "[t]he accusation that I may have acted on behalf of the Sheriff's Office to gain a conviction resulting in a man's life being taken away from him is offensive to me." J.A. 1159. Holland later executed an affidavit for the State, asserting, inter alia, that he informed the trial court of the EEOC matter at the time he was first

By its order of July 15, 2005, the MAR court denied relief on Stephens's conflict claim — the only remaining claim from the Second MAR proceedings. *See State v. Stephens*, No. 95 CRS 787-791, 2855 (N.C. Super. Ct. July 15, 2005) (the "Second MAR Order").**[7]** The MAR court deemed the conflict claim procedurally barred for several reasons. First, it ruled that the conflict claim was procedurally barred because it was duplicative of the conflict claim in the First MAR. *See* N.C. Gen. Stat. §15A-1419(a)(2) (specifying a ground for denial of a motion for appropriate relief if the "issue underlying the motion was previously determined on the merits . . . upon a previous motion or proceeding in the courts of this State"). Second, the court ruled that even if the conflict claim in the Second MAR were different from the one alleged in the First MAR, it would yet be procedurally barred because Stephens could have raised it in the First MAR. *See id.* § 15A-1419(a)(1) (calling for denial of a motion for appropriate relief when "[u]pon a previous motion [for appropriate relief], the defendant was in a position to adequately raise the

---

appointed to represent Stephens. Confronted about his conduct during the evidentiary hearing, Holland testified that he was "not sure [he could] stand behind" his March 20, 2000 letter to Stephens's initial post-conviction counsel, in that the letter was "not done thoroughly, [was] not abundantly accurate, and contain[ed] a little venom." *Id.* at 933. Holland was also forced to admit that he could not have disclosed the EEOC matter to the trial court at the time he was appointed to represent Stephens, based on documents reflecting that the EEOC matter was not filed until several months later; Holland explained that he had "told that same story so long [he] believed it." *Id.* at 946. Overall, Holland was certainly more forthcoming during the evidentiary hearing than he had been before. As Stephens describes it, however, Holland's testimony about the EEOC matter in particular was yet largely limited to "acknowledging the inescapable content of Stephens' exhibits." Br. of Pet'r 27. Whatever the reason for Holland's lack of cooperation — perhaps a misapprehension of his attorney-client privilege obligations or irritation at being accused of ineffective assistance — it clearly hindered the development of Stephens's conflict claim.

**[7]**The Second MAR Order is found at J.A. 1320-51.

ground or issue underlying the present motion but did not do so"). Finally, the MAR court ruled that the conflict claim was barred under section 15A-1419(a)(3) because Stephens could have raised it in his direct appeal to the Supreme Court of North Carolina.[8]

As an alternative to its ruling on the procedural bar issue, the MAR court further concluded that the conflict claim was meritless. In ruling on the merits, the court acknowledged the new discoveries regarding the EEOC matter, but reiterated its conclusions in the First MAR Order that no actual conflict of interest existed and, in any event, that there was no adverse impact on Holland's representation of Stephens. Stephens's subsequent petition for certiorari to the Supreme Court of North Carolina was denied. *See State v. Stephens*, 632 S.E.2d 771 (N.C. 2006).

## C.

On May 23, 2006, Stephens filed his 28 U.S.C. § 2254 petition for habeas corpus relief in the Eastern District of North Carolina. In this petition, Stephens raised, inter alia, the conflict claim previously raised in the MAR Amendment. The parties then filed cross-motions for summary judgment. Stephens also requested an evidentiary hearing on the conflict claim and sought leave to conduct discovery on the ground that "facts and evidence essential to prove [his] claim [were] in the possession of the State of North Carolina." J.A. 125. On September 25, 2008, the district court denied Stephens's requests for an evidentiary hearing and discovery, and it granted summary judgment to the State on all of Stephens's

---

[8]In its Second MAR Order, the court also concluded that Stephens's contention regarding ineffective assistance of his initial post-conviction counsel did not excuse him from the procedural bar created by the First MAR Order.

§ 2254 claims. *Stephens v. Branker*, No. 5:06-hc-02097-BO (E.D.N.C. Sept. 25, 2008) (the "Habeas Order").[9]

Stephens thereafter filed a motion, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend the judgment, which the district court denied. The court, however, granted Stephens the COA on his conflict claim. Stephens filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. In this appeal, Stephens contends that he is entitled to relief on the merits of his conflict claim or, alternatively, further discovery.

## II.

We review de novo a district court's denial of habeas corpus relief on the basis of a state court record. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). Insofar as a state court adjudicates a claim on its merits, the state decision is entitled to deference pursuant to the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d). AEDPA requires the use of a two-step analysis to assess whether a habeas corpus petitioner is entitled to relief. Under the first step of that analysis, we may award relief only if (1) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* Further, even if an error is identified, habeas corpus relief can only be granted, under the second step of the AEDPA analysis, if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakus v. United States*, 328 U.S. 750, 776 (1945). Finally, the state court's factual determinations are presumed to be correct and may be rebut-

---

[9]The Habeas Order is found at J.A. 179-233.

ted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

We review for abuse of discretion a district court's decision not to authorize discovery on a habeas corpus claim. *See Hill v. Ozmint*, 339 F.3d 187, 193 (4th Cir. 2003). "Rule 6(a) of the Rules Governing Section 2254 Cases requires a habeas petitioner to show good cause before he is afforded an opportunity for discovery." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998).

## III.

### A.

#### 1.

Stephens asserts that he is entitled to habeas corpus relief because Holland, as one of Stephens's two trial attorneys, labored under a conflict of interest that impaired Holland's representation and contravened Stephens's Sixth Amendment right to the effective assistance of counsel. In denying Stephens's § 2254 petition for habeas relief, the district court began by ruling — contrary to the MAR court — that the conflict claim was not procedurally barred. The district court determined that section 15A-1419(a)(3) of the General Statutes of North Carolina did not apply because North Carolina Rule of Appellate Procedure 9(a) prohibited Stephens from raising the conflict claim on direct appeal, and subsections (1) and (2) of the statute did not bar the proceeding because the factual basis for the claim was not available until the time of the Second MAR. *See* Habeas Order 15-16. The State has not challenged the court's procedural bar ruling on appeal, and we have no reason to consider it *sua sponte*. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter.").

Turning to the merits of the conflict claim, we must first determine if the MAR court's conclusions are entitled to AEDPA deference. As the district court observed, the MAR court concluded that the conflict claim was procedurally barred and, alternatively, that it was meritless. *See* Habeas Order 16. Although the MAR court's primary holding — that the conflict claim was procedurally barred — was not an "adjudication on the merits" under 28 U.S.C. § 2254(d), its alternative holding was a merits ruling. Though we have approved of alternative holdings in other contexts, our Court has not previously decided whether a state court's alternative holding is entitled to AEDPA deference when its primary ruling of a procedural bar is erroneous. *See Ashe v. Styles*, 39 F.3d 80, 87 (4th Cir. 1994) ("[T]he very nature of our federal system dictates that alternative holdings based on state law issued by state courts must be accorded respect."). However, at least two of our sister circuits have addressed and disposed of this issue. In *Brooks v. Bagley*, the Sixth Circuit concluded that a state court's ruling on the merits of a § 2254 claim is entitled to AEDPA deference even if the state court also deemed the claim procedurally defaulted. *See* 513 F.3d 618 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1316 (2009). The court explained its reasoning as follows:

> Just as a state court wishing to invoke an independent and adequate state ground to dispose of a case "need not fear reaching the merits of a federal claim in an alternative holding," so it need not fear losing the benefit of the doubt that AEDPA gives to state court rulings whenever it invokes an independent and adequate state ground as an alternative holding.

*Id.* at 625 (quoting *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)) (citation omitted). Similarly, the Second Circuit has recognized that an alternative ruling is entitled to AEDPA deference if a state court reaches the merits of the claim. *See Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007).

Put succinctly, we agree with our sister circuits that an alternative merits determination to a procedural bar ruling is entitled to AEDPA deference. We therefore must accord AEDPA deference to the MAR court's ruling on the merits of the conflict claim.

2.

Accepting the district court's ruling that Stephens did not procedurally default the conflict claim, we nevertheless conclude that the Second MAR Order's determination on the merits of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Further, that order was not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1).

The Supreme Court has long "recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). The attorney-client relationship begets a duty of loyalty — one that requires the attorney to remain free from conflicts of interest. *Id.* at 688. Yet, the Court has also recognized that certain potential conflicts of interest may not, in practice, contravene this duty of loyalty. In *Cuyler v. Sullivan*, the Court held that "the *possibility* of conflict is insufficient to impugn a criminal conviction." 446 U.S. 335, 350 (1980) (emphasis added). To establish a violation of his Sixth Amendment right, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348. If a defendant can prove these two elements — that his attorney labored under an actual conflict of interest and that the attorney's conflict adversely affected his representation — prejudice to the client is presumed. *Strickland*, 466 U.S. at 692 (citing *Cuyler*, 446 U.S. at 348-50). "Adverse effect cannot be presumed," however, "from the mere existence of a conflict of interest." *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002).

a.

To satisfy the first prong of the *Cuyler* test — the existence of an actual conflict of interest — a habeas petitioner "must show that [his] interests 'diverge[d] [from his attorney's] with respect to a material factual or legal issue or to a course of action.'" *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (quoting *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part)). The MAR court concluded that Holland's representation of various Johnston County entities (including the Sheriff's Office) at the same time he represented Stephens did not amount to a conflict of interest.

To be sure, Stephens has presented strong evidence that Holland represented conflicting interests during the trial — especially the evidence of Holland's involvement in the EEOC matter. Indeed, the record suggests that Holland could well have found himself between a rock and a hard place, forced to choose between violating his attorney-client privilege with the Sheriff's Office, on the one hand, and failing to zealously represent Stephens in his capital murder trial, on the other. Although such a concurrent representation was certainly ill-advised, we decline to decide if it constituted an actual conflict of interest. We instead conclude that, even assuming Holland labored under a conflict at the time of trial, Stephens is not entitled to habeas relief because he has failed to show that the conflict adversely affected Holland's trial performance.

b.

In order to prevail on a conflict claim, a habeas petitioner must establish, under the second prong of *Cuyler*, that the actual conflict of interest compromised his attorney's representation. This occurs "when an attorney takes action for one client that is necessarily adverse to another, or when an attorney fails to take action for one client for fear of injuring

another." *Jones v. Polk*, 401 F.3d 257, 267 (4th Cir. 2005). In analyzing this issue, we use the three-factor test described in *Mickens v. Taylor*:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision**.** [To demonstrate objective reasonableness,] the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

240 F.3d 348, 361 (4th Cir. 2001) (en banc) (citation omitted) (quoting *United States v. Tatum*, 943 F.2d 370, 376 (2001)).

In assessing whether Holland's assumed conflict had an adverse effect on his representation of Stephens, the MAR court made the following findings, which are entitled to AEDPA deference:

> At the evidentiary hearing Stephens failed to prove that Mr. Holland's representation of any of the Johnston County agencies induced Mr. Holland to compromise his zealous representation of Stephens in any way. In fact, at the hearing Mr. Holland testified, "I did not see, in any information I was receiving from the Sheriff [regarding the EEOC claim], anything that impacted my zealous representation of Davy Stephens." A review of the record confirms that Mr. Holland zealously defended Stephens and pursued all available defenses and trial strategies which were of help to Stephens. Mr. Holland, along with Ms. Huntsberry, vigorously cross-examined

sheriff's deputies, questioning their every action and inaction, identification techniques and investigatory methods.

Second MAR Order 27-28 (citation omitted). The MAR court supported its analysis with a litany of references to the record. Specifically, the court explained that Holland:

- Cross-examined Deputy Miller about his failure to get a description of the assailant from a neighbor;

- Objected to Deputy Lee's testimony and cross-examined her;

- Objected to Detective Benson's and Deputy Hicks's testimony about finding Stephens in the attic with a gun; and

- Cross-examined Detective Hinton and objected to his testimony regarding photo line-ups.

*See id.* at 28. The MAR court then concluded that, based on these facts, "Stephens failed to show that any alleged conflict of interest adversely affected Mr. Holland's performance." *Id.* at 29.

Stephens challenged the MAR court's ruling in his § 2254 petition to the district court. The court summarized Stephens's contention as follows:

Petitioner asserts he was adversely affected by Holland's work for the Sheriff's Department because his trial attorneys did not fully pursue the stated defense of showing that the Sheriff's Department was partly to blame for the murders because they were aware of the drug activity at the Grill Road house, but failed to do anything about it or were in cahoots with the

victims. Petitioner does not contend there was a different defense that was bypassed because of the alleged conflict. Petitioner only argues that his attorneys did not fully or adequately pursue the stated theory of attacking the Sheriff's Department.

Habeas Order 20-21. In support of his adverse effect theory, Stephens relied on the following alleged missteps by Holland, all prompted by the conflict of interest:

- Holland did not call Detective C.E. "Buddy" Berube, a narcotics squad detective who was part of a long-term investigation of the Grill Road crack house, as a witness at trial. Further, he failed to inquire into prior investigations at the Grill Road crack house when questioning the other officers and did not ascertain why Berube was at the Grill Road house half an hour before the murders;

- Holland failed to question other officers about an information leak surrounding the January 12, 1995 raid of the Grill Road house;

- Holland did not question any Sheriff's Office employees about former employee Edwards's improper handling of confidential data and information relating to search warrants; and

- Holland did not elicit testimony regarding Edwards's termination for improperly deleting files, nor did he establish that she had access to files related to the Grill Road homicides.

*See id.* The district court concluded, however, that "[n]othing petitioner has presented suggests that [Holland's trial strategy] was in any way influenced by [his] work for the Sheriff's Department." *Id.* at 25.

Stephens pursues the same theory of adverse effect in this appeal, maintaining that the district court erred in its ruling that AEDPA barred an award of habeas corpus relief. He has failed, however, to establish that Holland's conduct satisfied the three-factor adverse effect test of *Mickens*. *See* 240 F.3d at 361 (requiring habeas petitioner to (1) identify plausible alternative defense strategy, (2) establish that alternative strategy was objectively reasonable on facts available to attorney at time of his decision, and (3) show that attorney's decision not to pursue such strategy was linked to actual conflict). Put succinctly, Stephens has failed to satisfy both the second and third *Mickens* factors.

i.

Even assuming that Stephens's proposed defense strategies are plausible, they fail to meet the second factor of the *Mickens* test — the defenses simply were not objectively reasonable given the facts available to Holland at the time of trial. First, Stephens maintains that Holland erred by not questioning Sheriff's Office employees about the files that Edwards deleted. Stephens contends that Holland knew about these missing files because he was involved in the Edwards EEOC matter, and that pursuing this line of questioning was "clearly suggested by the circumstances," as required to satify the second *Mickens* factor. *See* 240 F.3d at 361. The MAR court, however, accepted as true Holland's testimony that he "was not aware of [the missing files] during the time of his representation of Mr. Stephens." Second MAR Order 22. Because Stephens has not rebutted this factual finding "by clear and convincing evidence," AEDPA requires us to accept that Holland did not know about the missing files. 28 U.S.C. § 2254(e)(1). Stephens's proposed line of questioning was therefore not clearly suggested by the circumstances, and the missing file defense was not objectively reasonable.

Second, as the district court explained in the Habeas Order, Stephens faults Holland for not arguing that "the Sheriff's

Department was partly to blame for the murders because they were aware of the drug activity at the Grill Road house, but failed to do anything about it." Habeas Order 20. There are numerous reasons why — even if it was aware of drug dealing at the Grill Road house — the Sheriff's Office could have decided to permit the crack house to continue operations. These alternatives range from attempting to identify the crack house's suppliers to simply observing the clientele visiting it. We accord law enforcement agencies broad deference with respect to such decisions. "I killed these people because you didn't arrest them first" is simply not a valid defense to a murder indictment.

Finally, Stephens maintains that Holland should have argued that the police were corrupt and "in cahoots" with the Grill Road drug dealers. Unfortunately for Stephens, although a police corruption defense can be an objectively reasonable one, there simply was not sufficient evidence to support such a theory on this record. Yet, as explained below, Holland actually did attempt to cast doubt on the conduct of the Grill Road triple homicide investigators at trial.

ii.

Relevant to the third *Mickens* factor, the MAR court found that, "in pursu[ing] all available defenses and trial strategies which were of help to Stephens," Holland and Huntsberry "vigorously cross-examined sheriff's deputies, questioning their every action and inaction, identification techniques and investigatory methods." Second MAR Order 28. In these habeas corpus proceedings, Stephens contends that Holland should have done more, but he fails to demonstrate that the trial decisions made by his counsel were anything other than tactical judgments. For instance, Stephens faults Holland for failing to question Detective Berube about the police corruption theory at trial. Stephens asserts that Holland's failure to call Berube is illustrative of Holland's ineffective representation, but it is entirely reasonable to assume that Holland did

not call Berube to testify *because* Berube was so deeply involved in the murder investigation. The prosecution's cross-examination could well have introduced potentially damaging evidence and, absent convincing proof of Berube being "in cahoots" with the drug dealers, it is quite possible that the jury would not have been persuaded by Holland's questioning. Further, Holland's testimony at the evidentiary hearing on the conflict claim supports the conclusion that his trial strategy with respect to Berube was based solely on a tactical decision. Before trial, Holland questioned Berube about his investigation of the Grill Road crack house and concluded that Berube simply did not have anything to hide. Absent some reason to believe that Berube could support the corruption theory, it is reasonable that Holland declined to question him at trial.

The trial record also shows that Holland aggressively sought to establish that the Grill Road crack house was subject to a long-term investigation by the Sheriff's Office, and that Berube had an unusually close connection to the case. At trial, Holland questioned Deputy Lee, an officer who worked on the drug task force, about undercover drug buys she had made from Wright and about the close proximity of Berube's home to the crime scene. He also questioned Deputy Miller, an officer who regularly patrolled the Grill Road area, about the reputation of the murder scene as a crack house and, again, about the close proximity of Berube's residence. Finally, Holland questioned Detectives Eatman and Hinton about these same issues. During his questioning of Hinton, Holland even sought to establish Berube's presence at the crime scene shortly before the murders. Holland's zealous questioning in these respects was limited only by the State's sustained objections.

Thus, the trial record shows that Holland's efforts with respect to the police corruption defense were anything but the watered-down, ineffective performance that Stephens describes on appeal. Holland established that the Sheriff's Office was aware that drugs were being sold at the Grill Road

residence, yet it failed to make any arrests. He further set the stage for the jury to infer that Berube was "in cahoots" with the Grill Road crack dealers by establishing that Berube lived close to the crime scene and did not immediately respond to the murders. And, as the *coup de grace* to his corruption theory, Holland even attempted to establish that Berube had been at the crack house just minutes before the shooting. Though Holland had only limited evidence of police corruption, he pursued this theory as far as the evidence would take it. Indeed, the record supports the MAR court's finding that Holland vigorously defended Stephens in the face of a powerful prosecution case.

Having carefully assessed the merits of the conflict claim, we are satisfied that — regardless of how ill-advised Holland's concurrent representations may have been — Stephens cannot establish that a conflict of interest adversely affected Holland's representation. Accordingly, Stephens is not entitled to habeas corpus relief on the record before us.

### B.

As an alternative to habeas relief, Stephens asks us to rule that the district court erred in denying his request for discovery on the conflict claim. He asserts that the North Carolina authorities possess undisclosed records relating to the deletion of files about the Grill Road triple homicide and other possible corruption in the Sheriff's Office.[10] In denying Stephens's request, the district court explained that he "offer[ed] no more than speculation that additional information may exist and [could not] show good cause for discovery to develop this

---

[10]Specifically, Stephens has sought leave to conduct discovery consisting of document requests, interrogatories, and depositions regarding investigations by the State Bureau of Investigation, the Johnston County District Attorney's Office, and the Sheriff's Office itself. In support of his discovery request, Stephens has identified specific investigations that are referenced in documents in his possession.

claim." Habeas Order 27. We review this decision for abuse of discretion. *See Connor v. Polk*, 407 F.3d 198, 204 (4th Cir. 2005).

Unlike other civil litigants, a § 2254 habeas petitioner "is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Instead, he must "show good cause before he is afforded an opportunity for discovery." *Quesinberry*, 162 F.3d at 279; *see also* Rules Governing Section 2254 Cases, Rule 6(a), 28 U.S.C. foll. § 2254. A showing of good cause must include specific allegations suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus relief. *Bracy*, 520 U.S. at 908-09; *see also Harris v. Nelson*, 394 U.S. 286, 290 (1969).

Put simply, Stephens's discovery request is deficient because — although he has identified specific information sought — he has not demonstrated that such discovery would result in him being entitled to habeas relief on the conflict claim. Stephens has made no showing that the information sought is material to the merits of his conflict claim. The district court thus did not abuse its discretion in making the challenged ruling with respect to discovery.

## IV.

Pursuant to the foregoing, we affirm the disposition of the district court on the conflict claim.

*AFFIRMED*