**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4158

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

FRANK CRAIG PURPERA, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Elizabeth Kay Dillon, District Judge.  (7:17-cr-00079-EKD-1)

Argued:  October 30, 2020                              Decided:  February 5, 2021

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.  Judge Diaz wrote an opinion concurring in part and dissenting in part.

**ARGUED:**  Blair Tamara Westover, LAW OFFICES OF BEAU B. BRINDLEY, Chicago, Illinois, for Appellant.  Laura Day Rottenborn, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.  **ON BRIEF:**  Beau B. Brindley, LAW OFFICES OF BEAU B. BRINDLEY, Chicago, Illinois, for Appellant.  Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dr. Frank Purpera ("Appellant") is a vascular surgeon who owned a medical practice in Blacksburg, Virginia, and was registered with the Drug Enforcement Administration ("DEA") to administer controlled substances. Between April 21, 2014, and August 4, 2016, Appellant purchased nearly 10,000 tablets of various controlled substances from Henry Schein, Inc., a medical supply distribution company ("Henry Schein"). On December 14, 2017, Appellant was charged with 67 counts of obtaining these controlled substances by fraud, in violation of 21 U.S.C. § 843(a)(3) (Counts 1–68);[1] one count of failing to maintain required records related to their disposition, in violation of 21 U.S.C. § 843(a)(4)(A) (Count 69); and one count of making a false statement to a DEA agent investigating Appellant's fraudulent activity, in violation of 18 U.S.C. § 1001(a)(2) (Count 70).

Following trial, a jury found Appellant guilty on all counts. Appellant moved for a judgment of acquittal, which the district court granted with respect to Count 21 but otherwise denied.[2] At sentencing, the district court calculated an advisory United States Sentencing Guidelines ("Guidelines") range of six to 12 months and imposed an above-Guidelines sentence of 20 months of imprisonment.

---

[1] Counts 1–68 of the indictment allege violations of 21 U.S.C. § 843(a)(3), but the indictment does not include a Count 27.

[2] The United States does not appeal the district court's grant of Appellant's motion for acquittal with respect to Count 21.

Appellant now claims that his convictions should be vacated for a multitude of reasons. He asserts (1) his trial counsel labored under a conflict of interest; (2) the district court erroneously refused two of his requested jury instructions; (3) the district court erroneously admitted expert testimony that contained impermissible legal conclusions; and (4) his convictions were not supported by sufficient evidence. Additionally, Appellant contends that his sentence is procedurally and substantively unreasonable. For the reasons that follow, we find each of these claims to be without merit and affirm Appellant's convictions and sentence.

## I.

### A.

From 2014 to 2016, Appellant purchased thousands of tablets of oxycodone (Percocet), hydrocodone (Lortab), alprazolam (Xanax), diazepam (Valium), and tramadol (Ultram) -- all controlled substances under federal law -- from Henry Schein. Pursuant to the company's policy, before completing these purchases, Appellant was required to submit purchase order forms that contained questions about "the approximate percentage of patients that leave [his] office with controlled substances daily"; "the approximate percentage of patients that are treated in [his] office with controlled substances daily"; and whether he uses "any of the controlled drug items [he] order[s] to treat family members or

4

friends."[3] J.A. 223–24.[4] At trial, the United States introduced evidence demonstrating that the purchase order forms Appellant submitted to Henry Schein contained inaccurate answers to these questions. For example, Appellant stated in his purchase order forms that he did not administer the drugs he purchased from Henry Schein to family members or friends, but in a June 23, 2017 letter to the Virginia Department of Health Professions, Appellant stated that the vast majority of those controlled substances were given to his wife, Rebecca Mosig.

At Appellant's trial, Shaun Abreu, a senior manager for Henry Schein, testified that the company requires prospective purchasers of its controlled substances to submit purchase order forms because the answers to the questions contained in the forms are important to the company when it decides whether or not to sell controlled substances to the prospective purchaser. Abreu explained that Henry Schein's policy is to only sell controlled substances to purchasers who will prescribe and administer them in compliance with all relevant "state medical board regulations," and the answers to the questions contained in the purchase order forms help the company determine if a potential purchaser will do so. J.A. 307. Abreu also testified that the purchase order forms must be "filled out

---

[3] At some point, Henry Schein removed the question about treating friends from its purchase order forms. However, the purchase order form submitted by Appellant in April 2014 contained that question.

[4] Citations to the "J.A." refer to the Revised Joint Appendix filed by the parties in this appeal.

and signed by" a party who is registered to administer controlled substances with the DEA. *Id.* at 306.

B.

Appellant first caught the attention of federal law enforcement in August 2016, when a DEA database revealed that he purchased more controlled substances than any other physician in western Virginia in 2015, and more than all but one in 2016. Further red flags were raised when the database revealed that, although Appellant purchased this high volume of controlled substances, he only prescribed them to two individuals: his wife and his mother.

The DEA's investigation of Appellant began in earnest on August 26, 2016, when DEA Investigator Mark Armstrong visited Appellant's office and questioned him about his purchase of oxycodone, alprazolam, and diazepam from Henry Schein. According to Investigator Armstrong's trial testimony, he asked Appellant if he maintained records related to the disposition of those drugs, and Appellant responded that he maintained such records in two different places: "in his patient file[s]," and in a separate "dispensing kind of log." J.A. 179. But when Investigator Armstrong then asked to review those records, Appellant quickly admitted "there wasn't a dispensing log." *Id.* A subsequent search warrant executed at Appellant's office revealed that there were no records in Appellant's patient files related to any of the drugs that he purchased from Henry Schein.

C.

Grand jury proceedings began in December 2017, and Kayla Castleberry, a former employee of Appellant, was called to testify. The day before her scheduled testimony,

6

Castleberry received text messages from Carla Craft, a then-current employee of Appellant who was also subpoenaed to testify before the grand jury. Throughout the text message exchange, Craft discouraged Castleberry from testifying before the grand jury without first securing legal representation. In one text, Craft wrote, "John is spazzing about you going alone tomorrow," and explained, "John is like freaked out that you're walking into a lions [sic] den." United States' Resp. in Opp'n to Def.'s Renewed Mot. to Dismiss Indictment for Prosecutorial Misconduct at 5, *United States v. Purpera*, No. 7:17-cr-79 (W.D. Va. Dec. 14, 2017; filed Jan. 26, 2018), ECF No. 88-1 [hereinafter United States' Resp. in Opp'n to Mot. to Dismiss Indictment]. Castleberry provided screenshots of these text messages to Robert Slease, a Special Agent with the United States Department of Health and Human Services who was working with the DEA task force investigating Appellant. Agent Slease interviewed Castleberry about the text messages. Castleberry said the conversation made her feel like she was "kind of being forced or coerced" to not testify. J.A. 56. Agent Slease suspected that John Brownlee, Appellant's lead trial counsel, was the "John" alluded to in Craft and Castleberry's text exchange. One week later, the DEA issued an administrative subpoena for the phone records related to the text message exchange. One of the phone numbers included in the subpoena belonged to Brownlee.

Upon learning of the DEA's administrative subpoena of his lead counsel's phone records, Appellant moved to dismiss the indictment, alleging prosecutorial misconduct and that the subpoena was an intentional and prejudicial invasion of the attorney-client privilege. The United States responded that there was no prosecutorial misconduct because the Government had subpoenaed the phone records not to learn the substance of

7

confidential attorney-client communications, but rather for the "very limited and legitimate purposes arising from the need to determine whether [Brownlee] was contacting a subpoenaed witness and encouraging her not to testify." United States' Resp. in Opp'n to Mot. to Dismiss Indictment at 1, ECF No. 88.[5] Appellant dismissed this explanation, asserting, "[T]here was no bona fide investigation into Mr. Brownlee." Dr. Frank Purpera's Reply in Supp. of His Renewed Mot. to Dismiss at 1–6, *United States v. Purpera*, No. 7:17-cr-79 (W.D. Va. Dec. 14, 2017; filed Jan. 27, 2018), ECF No. 92 [hereinafter Appellant's Reply in Supp. of Mot. to Dismiss Indictment]. On January 29, 2018, the district court held a pre-trial hearing on Appellant's motion to dismiss the indictment. The court ultimately denied the motion, finding no Government misconduct and no prejudice to Appellant. Appellant does not appeal this ruling, but now claims, through different counsel, that the DEA's investigation into Brownlee created a conflict of interest.

## II.

## A.

## Conflict of Interest

Appellant claims his representation at trial was tainted by a conflict of interest stemming from the fact that his prosecution paralleled the DEA's investigation of his lead trial counsel, Brownlee. The United States concedes that these circumstances caused

---

[5] The United States made clear at oral argument that the phone records were searched pursuant to an administrative subpoena that was issued unbeknownst to the United States Attorney's office. *See* Oral Argument at 19:00–21:05, *United States v. Purpera*, No. 19-4158 (4th Cir. Nov. 2, 2020), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

Brownlee to labor under a conflict of interest. However, the parties dispute whether Appellant validly waived the conflict and, if not, whether it was sufficiently significant as to warrant the reversal of Appellant's convictions.

The right to legal representation "that is free from conflicts of interest" is a "necessary corollary to" the right to effective assistance of counsel guaranteed by the Sixth Amendment. *Fullwood v. Lee*, 290 F.3d 663, 688–89 (4th Cir. 2002) (internal quotation marks omitted). Like other ineffective assistance of counsel claims, claims that a defendant's representation at trial was tainted by a conflict of interest "present mixed questions of law and fact that we review de novo." *United States v. Dehlinger*, 740 F.3d 315, 323 (4th Cir. 2014) (internal quotation marks omitted). Generally, to prevail on a conflict claim, a defendant must "establish that (1) an actual conflict of interest (2) adversely affected his lawyer's performance." *Id.* at 322. To determine whether a conflict adversely affected a lawyer's performance, we apply a three-part test originally articulated by the Eleventh Circuit in *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (en banc). *See Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc) (adopting the *Freund* test). The *Mickens* court described that test as follows:

> First, the [defendant] must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the [defendant] must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. . . . Finally, the [defendant] must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Id.*

9

If, however, a case involves what the Supreme Court has described as a "per se" violation of the Sixth Amendment, a showing of adverse effect is not necessary and the underlying conviction must be reversed. *See United States v. Cronic*, 466 U.S. 648, 659–60 (1984). The Supreme Court has recognized only three categories of per se violations of the Sixth Amendment: (1) "the complete denial of counsel;" (2) "counsel entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing;" and (3) where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." *Id.*

1.

We begin by assessing whether Appellant validly waived Brownlee's conflict of interest. At the pre-trial hearing, the district court addressed the possibility that the administrative subpoena of Brownlee's phone records created a conflict of interest in his representation of Appellant. The district court accorded Appellant roughly 12 minutes to discuss with his attorneys -- including Brownlee -- whether he wanted to continue his defense with the same counsel. Following that discussion, the court inquired as to whether Appellant would "voluntarily, without [the court] requiring it, be willing to . . . waive[] any conflict." J.A. 138. Appellant responded, "[T]his is my team that I hired. I'm innocent. I would like to move forward and get my life together." *Id.* The court then asked Appellant whether his counsel had explained to him "that there might be a potential for a conflict of interest" stemming from the subpoena of Brownlee's phone records, and whether he nonetheless was "still willing to go forward with [the same] counsel . . . representing" him. *Id.* at 138–39. Appellant answered both questions in the affirmative.

10

We conclude that, despite the district court's colloquy, Appellant did not validly waive Brownlee's conflict of interest. To validly waive a conflict of interest, a defendant must possess a "knowledge of the crux of the conflict *and* an understanding of its implications." *United States v. Brown*, 202 F.3d 691, 698 (4th Cir. 2000) (emphasis in original). While it is clear Appellant was aware of the potential conflict of interest, we are not convinced that he was aware of its implications. For starters, the district court never explicitly confirmed that Appellant understood that Brownlee's conflict could negatively impact the quality of his legal representation. Furthermore, because Brownlee did not believe that the witness tampering investigation was legitimate, and because defense counsel stated that they saw "no issue with regard to any conflict or potential conflict," J.A. 136, it is plausible that those implications were never adequately explained to Appellant during his 12-minute conversation with his attorneys. Finally, we reject the United States' argument that Appellant must have understood the crux of the conflict as a result of his being present for the entire pre-trial hearing. The bulk of that hearing was devoted to determining whether the administrative subpoena of Brownlee's phone records constituted prosecutorial misconduct, not whether it created a serious conflict of interest.[6]

---

[6] Tellingly, the district court -- which conducted the colloquy regarding the conflict of interest -- did not find Appellant's waiver to be intelligent and knowing. The district court was concerned that Appellant was never "advised specifically about the possible implications of the conflict." J.A. 634.

11

2.

Because Appellant did not validly waive Brownlee's conflict of interest, we now must determine whether the conflict was so significant as to require the reversal of Appellant's convictions. Reversal is required if the conflict (1) constitutes a per se violation of the Sixth Amendment;[7] or (2) adversely affected Brownlee's representation of Appellant. Here, Appellant cannot establish that reversal is required under either approach.

a.

Appellant has been represented by counsel at every stage of his criminal proceedings. Furthermore, it cannot be said that Appellant's lawyers "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," *Cronic*, 466 U.S. at 659, as defense counsel cross-examined each of the United States' trial witnesses and filed, inter alia, a motion to dismiss the indictment, motions to exclude key evidence and witnesses, a motion for a new trial, and a motion for judgment of acquittal. Therefore, to establish a per se violation of the Sixth Amendment, Appellant must demonstrate that Brownlee's conflict of interest made "the likelihood that any lawyer, even a fully competent one, could provide effective assistance [] so small that a presumption of prejudice is appropriate." *Id.* at 660. "This is an extremely high showing for a criminal defendant to make," *Brown v. French*, 147 F.3d 307, 313 (4th Cir. 1998), and we have been careful to not "broaden the

_____

[7] At oral argument, Appellant argued that if a conflict of interest results in a per se violation of the Sixth Amendment, it may not be waivable in the first place. Because we conclude that Appellant did not validly waive Brownlee's conflict, we need not decide whether that is an accurate statement of the law in the Fourth Circuit.

per-se prejudice exception to *Strickland*," *Glover v. Miro*, 262 F.3d 268, 277 (4th Cir. 2001).

In arguing that Brownlee's conflict of interest meets this demanding standard and requires per se reversal of his convictions, Appellant urges us to adopt the following position, which he describes as a "basic rule" that has been "recognized by the Second Circuit": that "un-waived conflicts of interest[] stemming from an investigation into trial counsel for conduct related to the defendant's case are per se reversible and do not require" a showing of adverse effect.[8] Appellant's Reply Br. 11–12.

To the extent the Second Circuit recognizes a "basic rule" concerning per se reversal based on conflicts of interest, Appellant miscomprehends it. In the Second Circuit, automatic reversal of a conviction is required when a defendant establishes that his attorney labored under a so-called "'per se' conflict of interest, i.e., one that does not as a matter of law admit of harmless-error analysis." *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000). There are only two situations that give rise to a per se conflict of interest: "where trial counsel is not authorized to practice law," and where trial counsel "is implicated in the very crime for which his or her client is on trial." *Id.*; *see also Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988) (refusing to expand automatic reversal for conflicts of interest beyond these two situations).

---

[8] Appellant does not claim that the Fourth Circuit has adopted a "per se reversal" rule for conflicts of interest stemming from a government agency's parallel investigation of an attorney and his client. We decline to announce such a rule in this case.

Even if we were to adopt this approach, Brownlee's conflict of interest would not warrant per se reversal of Appellant's convictions. The Second Circuit has explained that the existence of a per se conflict hinges on "the similarity of counsel's activities to [the client]'s schemes and the links between them." *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir. 1984). Applying this framework, the Second Circuit has found a per se conflict of interest in a case where a defense attorney was believed to be participating in insurance fraud schemes that were similar to those for which his clients were on trial, *see id.* at 868, and in a case where a defendant was on trial for his participation in a heroin smuggling scheme and there was evidence demonstrating "that the defense counsel was . . . involved in heroin trafficking of his own," *United States v. Fulton*, 5 F.3d 605, 607 (2d Cir. 1993). In those cases, the substantial similarity between the attorneys' misconduct and the clients' misconduct is clear. In contrast, the potential witness tampering that led the DEA to subpoena Brownlee's phone records and the fraudulent behavior underlying Appellant's criminal convictions are completely different types of misconduct. For that reason, even under the Second Circuit approach that Appellant urges us to adopt, per se reversal of Appellant's convictions would be inappropriate, and Appellant would need to demonstrate that Brownlee's conflict of interest adversely affected his representation.

b.

Appellant posits two different ways in which he believes Brownlee's conflict of interest adversely affected his representation. He argues that because of the conflict, Brownlee (1) failed to call Appellant's wife, Rebecca Mosig, as a witness in his case-in-chief; and (2) failed to vigorously cross-examine Carla Craft, one of the witnesses for the

14

United States. Even assuming that these are plausible alternative defense tactics[9] that were objectively reasonable at the time of trial, Appellant cannot establish adverse effect under *Freund* because he has not shown that Brownlee's failure to pursue those tactics was in any way linked to his conflict of interest.

Appellant attempts to establish a link between Brownlee's conflict of interest and the decisions not to call Rebecca Mosig as a witness and vigorously cross-examine Carla Craft by arguing that pursuing these tactics "was inherently in conflict with" Brownlee's "other loyalties or interests." *United States v. Nicholson*, 611 F.3d 191, 212 (4th Cir. 2010) (internal quotation marks omitted). In Appellant's view, being the subject of a witness tampering investigation made Brownlee fearful of angering the DEA and caused him to labor "under a conflict that provided him with a personal incentive to pull his punches." Appellant's Br. 29. Appellant concludes that *any* decision by Brownlee to pursue a less aggressive defense strategy -- such as not calling Rebecca Mosig as a witness or failing to vigorously cross-examine Carla Craft -- was a manifestation of that fear and was "necessarily" linked to the conflict, "even if only subconsciously." *Id.* at 16, 29.

We do not doubt that a federal law enforcement agency investigating a defense attorney while simultaneously investigating his client can create a serious conflict of interest. Furthermore, we are sympathetic to Appellant's concerns that an attorney who finds himself in such a position may feel compelled to defend his client less vigorously.

---

[9] Brownlee's co-counsel cross-examined Craft at trial, so it is not clear that Brownlee cross-examining Craft is a plausible *alternative* defense tactic.

15

However, the facts of this case simply do not bring these concerns to fruition. It is clear from defense counsel's filings -- especially those related to the motion to dismiss for prosecutorial misconduct -- that Brownlee did not believe that he was the target of a bona fide federal investigation or that he faced any criminal exposure.[10] Instead, Brownlee viewed the purported investigation as an attempt by the United States to access confidential attorney-client information. Because Brownlee did not believe that he was a target of a legitimate criminal investigation, it was not inherently against his personal interest to engage in an aggressive defense of Appellant.

Additionally, counsel for the United States explained at oral argument that it was the DEA, not the United States Attorney's office, that issued the administrative subpoena that led to the production of Brownlee's phone records. *See* Oral Argument at 19:00–21:05, *United States v. Purpera*, No. 19-4158 (4th Cir. Nov. 2, 2020), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. Even if this subpoena made Brownlee wary of angering the DEA, it does not necessarily follow that he would feel incentivized to pull his punches when litigating Appellant's case.

---

[10] *See* Appellant's Reply in Supp. of Mot. to Dismiss Indictment at 2 (criticizing the DEA's decision to open an obstruction of justice investigation based on Brownlee's recommendation that a grand jury witness secure legal representation as "an extraordinary position"), 3 (stating that it "is not believable" that the DEA subpoenaed Brownlee's phone records pursuant to an "obstruction of justice investigation into his conduct"), 4 (asserting that "there was no bona fide investigation into Mr. Brownlee" and that there was "no evidence" that the decision was made to investigate Brownlee for potential obstruction of justice), 5 (claiming that "the government had no basis for the subpoena in a new or ongoing investigation").

Finally, the idea that Brownlee was pulling punches in order to appease the DEA is not supported by the record. The district court docket demonstrates that Appellant's trial counsel -- including Brownlee -- pursued an aggressive litigation strategy. Brownlee himself filed several important pre-trial and post-trial motions *after* learning that the DEA had subpoenaed his phone records as part of its witness tampering investigation, including a motion to exclude expert testimony, motion for judgment of acquittal, and motion for a new trial. If Brownlee was indeed pulling punches in order to appease the DEA, it would not make sense for him to file those motions, but stop short of calling Rebecca Mosig as a witness or vigorously cross-examining Carla Craft.

B.

Jury Instructions

Appellant claims the district court erred by refusing two of his requested jury instructions -- one related to Counts 1–68 (the acquiring controlled substances by fraud charges), and one related to Count 69 (the failing to maintain required records charge). We review a district court's decision to refuse a proposed jury instruction for abuse of discretion. *See United States v. McLaurin*, 764 F.3d 372, 378–79 (4th Cir. 2014). However, "we conduct a de novo review of any claim that jury instructions incorrectly stated the law." *Id.* at 379.

1.

The district court instructed the jury that in order to find Appellant "guilty on each of the 67 counts in Counts 1 through 68," the United States "must prove each of the following beyond a reasonable doubt:" (1) Appellant "acquired or obtained possession of

17

a controlled substance"; (2) Appellant "did so by fraud, forgery, deception, subterfuge, or material representation"; and (3) Appellant "acted knowingly or intentionally." J.A. 586. The jury instructions also included definitions for several key words, such as "fraud," "misrepresentation," and "material."

Appellant argues that the district court's instructions incorrectly stated the law of 21 U.S.C. § 843(a)(3) because they did not include a but-for causation requirement linking Appellant's false or misleading statements to his actual acquisition of the controlled substances. Specifically, he asserts that the district court erred by not issuing the following instruction:

> The misrepresentation, fraud, forgery, deception, or subterfuge must be an actual cause of how [Appellant] acquired or obtained possession of the controlled substance. If he still would have acquired or obtained possession regardless of the misrepresentation, fraud, forgery, deception, or subterfuge, then [the United States] has not proved [the] third element [of Counts 1–68].

Appellant's Br. 31–32.

Appellant's argument necessarily assumes that but-for causation is an element of 21 U.S.C. § 843(a)(3). The Fifth and Eighth Circuits have recognized but-for causation as an element of § 843(a)(3),[11] and the Sixth Circuit has assumed, without deciding, that it is an element. *See United States v. Bass*, 490 F.2d 846, 857 (5th Cir. 1974), *overruled on other grounds by United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984); *United States v. Wilbur*,

---

[11] The Third Circuit has also reached this conclusion, but in an unpublished decision. *See United States v. Adade*, 547 F. App'x 142, 146 (3d Cir. 2013).

18

58 F.3d 1291, 1292 (8th Cir. 1995); *United States v. Callahan*, 801 F.3d 606, 622 (6th Cir. 2015). The Fourth Circuit has never squarely addressed whether this statute contains a but-for causation requirement, and we need not do so today. Even assuming, as the Sixth Circuit did in *Callahan*, that it does, we conclude that the district court's jury instructions were not in error.

When reviewing whether jury instructions correctly stated the law, "we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state[d] the controlling law." *United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012). The district court's instructions for Counts 1–68, when viewed as a whole, conveyed to the jury that it was required to find a causal link between Appellant's fraudulent purchase order forms and Henry Schein's decision to sell him controlled substances. The jury was instructed that it needed to find, beyond a reasonable doubt, that Appellant acquired controlled substances "*by* fraud, forgery, deception, subterfuge, or material misrepresentation." J.A. 586 (emphasis supplied). The word "by" signaled to the jury that it had to find that Appellant acquired the controlled substances because of his fraud or misrepresentations. *See By*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/by (last visited Dec. 15, 2020) (defining "by" as "through the agency or instrumentality of"). Additionally, as part of its definition of the word "material," the court explained that the jury "must determine whether [an untrue] statement was one that a reasonable person might have considered important in making his or her decision." J.A. 587–88. This language reiterated to the jury that it was necessary to evaluate more than simply whether

19

Appellant's statements were untrue; it also needed to consider whether the statements were likely to influence Henry Schein when the company was deciding whether to sell controlled substances to Appellant.

2.

Count 69 charges Appellant with knowingly and intentionally omitting material information from a report or record required to be kept, in violation of 21 U.S.C. § 843(a)(4)(A). This charge stems from Appellant's failure to maintain a dispensing log or other documentation showing his disposition of controlled substances. A medical practitioner who regularly administers controlled substances is ordinarily required to maintain such records pursuant to federal regulations. *See* 21 C.F.R. § 1304(b). However, there is an exception to this record-keeping requirement that applies to practitioners who, inter alia, administer controlled substances "in the lawful course of professional practice." *Id.* § 1304.03(d).[12]

Appellant asserts that the district court's instructions with respect to Count 69 were flawed because the court did not instruct the jury that a medical practitioner acts within the lawful course of professional practice if he acts in good faith. Specifically, Appellant argues that the district court erred by refusing the following instruction:

> If a physician prescribes or administers a drug in good faith,
> then he has done so within the lawful course of professional
> practice. A physician prescribes or administers a drug in good

---

[12] This exception also requires that the medical practitioner not charge his patients for the controlled substances. However, in this appeal, the primary issue with respect to the exception is whether Appellant administered controlled substances in the lawful course of professional practice.

20

faith in medically treating a patient when he does so for a legitimate medical purpose in the usual course of medical practice. Good faith means good intentions and the honest exercise of best professional judgment as to the patient's needs. It means that the doctor acted in accordance with (what he reasonably believed to be) the standard of medical practice generally recognized and accepted in the United States.

Appellant's Br. 36.

A district court's refusal to provide a requested instruction is an abuse of discretion "only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Savage*, 885 F.3d 212, 223 (4th Cir. 2018).

The district court did not abuse its discretion by refusing Appellant's proposed good faith instruction because the instruction was not "correct." To begin with, Appellant does not point to any case that has recognized good faith as a defense to a § 843(a)(4)(A) charge, and we cannot find one. Appellant also argues that the good faith defense should be recognized in this case because it has been recognized in cases where physicians are charged with distributing controlled substances in violation of 21 U.S.C. § 841. But Appellant's proposed instruction is an inaccurate statement of even the § 841 good faith defense. We have made clear -- as has "every [other] court to specifically consider the question" -- that the good faith standard set out in those cases' jury instructions "must be an objective one." *United States v. Hurwitz*, 459 F.3d 463, 479 (4th Cir. 2006). Here, Appellant proposed a subjective -- and therefore legally incorrect -- instruction on the good faith defense.

21

In *Hurwitz*, we affirmed the district court's refusal of a proposed good faith instruction because, by defining good faith as "the doctor act[ing] according to what *he believed to be proper medical practice*," it "clearly set[] forth a subjective standard." 459 F.3d at 478 (emphasis in original). Appellant's proposed good faith instruction is similar to the one we rejected in *Hurwitz*. *See id.* Like the *Hurwitz* instruction, Appellant's proposed instruction permits a doctor "to decide for himself what constitutes proper medical treatment," thereby setting forth a standard for good faith that is entirely subjective. *Id.* Appellant attempts to justify his proposed instruction by arguing that it is similar to the good faith instruction approved by the Sixth Circuit in *United States v. Voorhies*, 663 F.2d 30, 34 (6th Cir. 1981), a case we cited favorably in *Hurwitz*. *See* 459 F.3d at 478. We are not persuaded. The instruction in *Voorhies* defined good faith as "an observance of conduct in accordance with what the physician *should* reasonably believe to be proper medical practice." 663 F.2d at 34 (emphasis supplied). That definition of good faith is meaningfully different from one that is based on what the physician *actually* believed. A jury tasked with assessing what a physician *should have* believed must apply an objective standard. In contrast, determining what a doctor *actually* believed requires a jury to assess the doctor's subjective point of view.

## C.

### Expert Witness Testimony

Appellant next claims the district court erroneously permitted the United States' expert witness, Dr. John Burton, a physician and Chair of Emergency Medicine at the Carilion Clinic in Roanoke, Virginia, to opine as to legal conclusions which Appellant

asserts Dr. Burton was not qualified to make. The United States introduced Dr. Burton's testimony as part of its effort to establish beyond a reasonable doubt that Appellant did not qualify for the exception to 21 U.S.C. § 843(a)(4)(A)'s record-keeping requirement. As explained previously, this exception applies to medical practitioners who, inter alia, administer controlled substances "in the lawful course of professional practice." 21 C.F.R. § 1304.03(d).

We review the admission of expert testimony for abuse of discretion. *See United States v. Landersman*, 886 F.3d 393, 411 (4th Cir. 2018). It is generally an abuse of discretion for the district court to admit "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). However, we have cautioned, "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern," and "drawing that line requires a case-specific inquiry of the charges, the testimony, and the context in which it was made." *United States v. Campbell*, 963 F.3d 309, 314 (4th Cir. 2020).

We find no abuse of discretion in the admission of Dr. Burton's testimony. In this case, whether Appellant qualified for the exception to the record-keeping requirement turned on whether he administered controlled substances in the *lawful* course of professional practice. Dr. Burton never opined as to the legality or illegality of Appellant's conduct. In fact, the district court ordered that his testimony "stay[] away from the words 'lawful' and 'legal'" because he "isn't a legal expert." J.A. 471–72. Rather, Dr. Burton's testimony primarily consisted of his opinions that Appellant's conduct fell "outside the

23

*usual* course of professional practice." *Id.* at 434, 439 (emphasis supplied). In *McIver*, we held that similar expert testimony, that is, a physician's opinion that a defendant's conduct "was outside the legitimate practice of medicine," did not contain impermissible legal conclusions because the language used by the witness fell "within the limited vernacular that is available to express whether a doctor acted outside the bounds of [] professional practice." 470 F.3d at 556, 562. The same is true of Dr. Burton's testimony. Therefore, we affirm the admission of Dr. Burton's expert testimony.

D.

Motion for Judgment of Acquittal

Appellant claims the district court erred by denying his motion for judgment of acquittal with respect to Counts 1–20, 22–26, and 28–70. He asserts there was insufficient evidence to support his convictions on these counts.

When reviewing the district court's denial of a motion for judgment of acquittal based on evidentiary sufficiency, we view "the evidence in the light most favorable to the government" and will affirm so long as there is "substantial evidence to support the conviction." *United States v. White*, 771 F.3d 225, 230 (4th Cir. 2014). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* Defendants face an uphill battle under this standard, as "the jury's verdict must stand unless we determine that *no* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013) (emphasis supplied).

24

1.

Counts 1–20, 22–26, and 28–68 charge Appellant with violations of 21 U.S.C. § 843(a)(3), which provides, "It shall be unlawful for any person knowingly or intentionally . . . to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." The indictment alleges Appellant violated this provision by falsely asserting to Henry Schein "that the controlled substances were dispensed to his patients" and by falsely denying that "any of the controlled substances were used by him personally" or "that he used any of the controlled substances in the treatment of his spouse or family or friends." J.A. 23.

Appellant asserts the United States "failed to prove with any evidence that [he] did not use any of the requested controlled substances to treat his patients." Appellant's Br. 46. This argument is inconsistent with the record. The United States introduced ample evidence at trial demonstrating that Appellant did not use the controlled substances that he purchased from Henry Schein to treat his patients. For example, Investigator Armstrong testified that a DEA search of Appellant's patient files "found that there were no records of dispensing or administration for any of the drugs that were purchased from Henry Schein." J.A. 198. In addition, four different former or current employees of Appellant testified that they never saw Appellant administer controlled substances to his patients.

Appellant also asserts that, even if the United States could prove that the purchase order forms he submitted to Henry Schein were fraudulent, it cannot establish that his fraud

was a but-for cause of the company's decision to sell him controlled substances.[13] Appellant's argument in this regard proceeds as follows: Shaun Abreu, a senior manager for Henry Schein, testified that had Appellant been truthful on the purchase order forms about using the controlled substances to treat family members and friends, the company's "next step" would have been to consult the relevant Virginia regulations to determine whether such treatment is permissible in the state. J.A. 310. The company's research would have revealed that while state regulations prohibit the *prescribing* of controlled substances to family members, they do not prohibit the *administering* of controlled substances to family members or friends. For this reason, Appellant concludes that Henry Schein would have sold him the controlled substances even if he had answered the questions in the purchase order forms honestly, so his fraud is not a but-for cause of his acquisition of the drugs.

We first note that per the testimony at trial, Henry Schein actually relied on Appellant's purchase order forms when deciding whether to sell him controlled substances. Shaun Abreu repeatedly testified that the answers to the questions contained in those forms were material to Henry Schein, and further testified that had Appellant been honest about using the controlled substances to treat family members and friends, the company "would not have filled [his] order." J.A. 414. This evidence is sufficient to establish that

---

[13] Like Appellant's argument that the district court erred by refusing his requested jury instruction on causation, this argument necessarily assumes that 21 U.S.C. § 843(a)(3) includes a but-for causation requirement. As we did when we analyzed the jury instruction issue, we will assume, without deciding, that it does.

26

Appellant's fraud was subjectively material to Henry Schein. However, that is not the end of our inquiry, as the materiality standard in criminal fraud cases is an objective one. *See United States v. Raza*, 876 F.3d 604, 620 (4th Cir. 2017). Objective materiality hinges not on whether Henry Schein actually found Appellant's purchase order forms to be material, but whether a reasonable company would have done so under identical circumstances.

We conclude that sufficient evidence supports a jury finding that Appellant's statements on the purchase order forms were objectively material. Medical supply distribution companies like Henry Schein are subject to certain DEA regulations. Abreu explained in his trial testimony that, because of these regulations, it is in the best interest of medical supply distribution companies to be selective about the medical practitioners to whom they sell controlled substances, and to ensure that the practitioners use the controlled substances in compliance with all applicable laws and regulations. A medical supply distribution company selling controlled substances in Virginia, then, would certainly be aware of 18 Virginia Administrative Code § 85-20-25, a state regulation that governs a medical practitioner treating or prescribing for self or family.[14] As Appellant points out, this section does not appear on its face to prohibit a medical practitioner from administering controlled substances to family members or friends. However, it does make clear that a practitioner may not *prescribe* controlled substances to family members, and may only

---

[14] Section 85-20-25 provides, in relevant part, "Treating or prescribing shall be based on a bona fide practitioner-patient relationship, and prescribing shall meet the criteria set forth in § 54.1-3303 of the Code of Virginia," and that, subject to exceptions not present here, "[a] practitioner shall not prescribe a controlled substance to himself or a family member." 18 Va. Admin. Code § 85-20-25.

27

administer controlled substances to family members pursuant to a bona fide practitioner-patient relationship.

Even though this regulation does not expressly prohibit the administering of controlled substances to family members or friends, Appellant stating that he engaged in that practice would have reasonably caused a medical supply distribution company to decide against selling to him. For starters, administering controlled substances to family members or friends raises questions about the existence of a bona fide practitioner-patient relationship. Furthermore, a practitioner administering controlled substances to his family members reasonably raises concerns about him *prescribing* to his family members as well. In sum, although administering controlled substances to family members may not itself violate Virginia medical regulations, a practitioner admitting that he engages in such conduct could reasonably make a medical supply distribution company leery that the practitioner would violate those regulations in some other way. For these reasons, we find ample support in the record for the conclusion that Appellant's misstatements were objectively material, and reject Appellant's argument that the purchase order forms did not impact Henry Schein's decision to provide him with the controlled substances.

The dissent posits that there is insufficient evidence to support Appellant's convictions on Counts 1–6, 17–20, 28, 40–43, and 55. These counts stem from Appellant's statement on the April 16, 2014 purchase order form that he does not "use any of the controlled drug items . . . to treat family members or friends." J.A. 309–10. As the dissent acknowledges, "[T]his statement was undeniably false" because Appellant "treated [Rebecca] Mosig with such substances." *Post* at 40. However, the dissent submits that

28

this misstatement was not material to Henry Schein's decision to fill the orders Appellant placed in connection with the April 16, 2014 form. In the dissent's view, because Appellant and Rebecca Mosig were not yet married as of April 16, 2014, they were merely friends when Appellant filled out and submitted that purchase order form. Accordingly, because Virginia law does not prohibit practitioners from prescribing or administering controlled substances to friends, the dissent concludes that Henry Schein would have sold controlled substances to Appellant even if his answers on the purchase order form had been truthful.

The dissent's conclusion is flawed in two respects. First, it ignores the fact that, under Virginia law, a prescription for controlled substances "may be issued only to persons . . . with whom the practitioner has a bona fide practitioner-patient relationship." Va. Code Ann. § 54.1-3303.[15] This requirement applies to everyone, including family members and friends of a practitioner. It would be reasonable, then, that if Henry Schein consulted relevant state law, it would be concerned not only with whether a practitioner treats his friends with controlled substances, but also with whether the practitioner prescribes to his friends outside the scope of a bona fide practitioner-patient relationship. Second, the dissent does not take into account the fact that Appellant and Rebecca Mosig were married on April 26, 2014 -- just ten days after Appellant filled out and submitted the April 16, 2014 purchase order form. *See* Br. for Appellant 47. Had Appellant truthfully answered that form's question about treating family members or friends, he would have had to

---

[15] This quotation states Section 54.1-3303 as it existed when it was entered into evidence by the United States. The current version of this section utilizes slightly different language.

explain that he used the controlled substances to treat a woman who within a matter of days would be converted from friend to wife. *See* Government Exhibit 5-3 (April 16, 2014 Controlled Substance Form) at 1, *United States v. Purpera*, No. 7:17-cr-79 (W.D. Va. Dec. 14, 2017; filed Feb. 2, 2018), ECF No. 114-3 (instructing Appellant to "Please explain" an affirmative response to the question about using controlled drug items to treat family members or friends). Henry Schein reasonably would have been troubled by this information. As the dissent recognizes, "[A] sensible drug company might well be concerned about the lack of a bona fide practitioner-patient relationship when a doctor purports to treat family members, because a doctor in Virginia is prohibited from prescribing controlled substances to family members." *Post* at 42–43. These same concerns would have been raised had Appellant been truthful when filling out the April 16, 2014 form, because his answers would have put Henry Schein on notice that he used the company's controlled substances to treat someone who was to become a family member in a matter of days.

### 2.

Count 69 charges Appellant with knowingly failing to maintain records related to his disposition of controlled substances, in violation of 21 U.S.C. § 843(a)(4)(A). The primary dispute with respect to Count 69 is whether the United States met its burden of proving beyond a reasonable doubt that Appellant did not qualify for the exception to § 843(a)(4)(A)'s record-keeping requirement. Pursuant to this exception, a medical practitioner "is not required to keep records of controlled substances . . . which are administered in the lawful course of professional practice." 21 C.F.R. § 1304.03(d).

The district court found that Dr. Burton's expert opinion that Appellant's treatment of his wife was outside the usual course of professional practice was "substantial evidence from which a reasonable jury could find that [Appellant] did not administer controlled substances 'in the lawful course of professional practice.'" J.A. 609. Appellant contends that even if Dr. Burton correctly opined that his actions violated the norms of the medical profession, that evidence by itself does not establish that he did not qualify for the exception to the record-keeping requirement. Appellant's position in this regard is consistent with the jury's instructions for Count 69, which provided, "[V]iolations of . . . professional norms alone are not sufficient" to prove that Appellant did not qualify for the exception. *Id.* at 591. Nonetheless, Appellant's argument is ultimately unavailing because it incorrectly assumes that Dr. Burton's testimony is the only evidence supporting the jury's finding that Appellant did not qualify for the exception.

The United States introduced ample evidence demonstrating that Appellant acquired the controlled substances that he administered to his wife through fraudulent means. Indeed, the jury convicted Appellant on 67 separate counts of that very crime. A finding that Appellant acquired controlled substances by fraud inherently supports the conclusion that his administering of those substances was not within the lawful course of medical practice. It may be true that Appellant administering controlled substances to his wife is not in itself a violation of any state or federal laws or regulations. However, in determining whether Appellant qualified for the exception to § 843(a)(4)(A)'s record-keeping requirement, the jury was required to assess not merely the ultimate administering of the controlled substance to his wife, but rather the entire *course* of professional practice

31

leading up to that point. Here, Appellant's course of practice began with an unlawful acquisition of controlled substances. That finding alone supports a conclusion that Appellant did not qualify for the exception to the record-keeping requirement, even if he did not commit an additional unlawful act when he subsequently administered those controlled substances to his wife.

3.

Count 70 charges Appellant with making a false statement to a federal investigator in violation of 18 U.S.C. § 1001(a)(2). The indictment alleges Appellant falsely stated to Investigator Armstrong that he kept records related to the dispensing of controlled substances in his patient files and that he maintained a separate dispensing log related to those drugs. We hold that the United States introduced sufficient evidence to support a conviction on Count 70 based on either of these statements.

a.

Appellant argues that his statement to Investigator Armstrong about the records he maintained in his patient files cannot support a conviction under § 1001(a)(2). According to Appellant, his statement to Investigator Armstrong was only that he maintained records in his patient files related to the disposition of *some* controlled substances, but not necessarily the substances he purchased from Henry Schein. Appellant concludes that since he maintained records related to his administering of lidocaine -- a controlled substance under Virginia law -- in the patient files, his statement to Investigator Armstrong was literally true and cannot support a conviction.

This argument is unavailing.  Appellant is correct that a § 1001(a)(2) conviction cannot be premised on a literally true statement, *see United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003), but this defense "applies only where a defendant's allegedly false statements were *undisputedly* literally true."  *United States v. Sarwari*, 669 F.3d 401, 406 (4th Cir. 2012) (emphasis in original) (internal quotation marks omitted).  The defense does not apply to "an answer [that] would be true on one construction of an arguably ambiguous question but false on another."  *Id.* at 407 (alteration in original).  Here, there is ambiguity surrounding the precise nature of Investigator Armstrong's question about the patient files.  Appellant asserts that Investigator Armstrong was asking about whether he maintained records in those files related to *any* controlled substances, while Investigator Armstrong testified at trial that he and Appellant discussed only the "oxycodone, Xanax, and Valium" that he purchased from Henry Schein, and "those are the drugs" that Appellant told him were "recorded in the patient files."  J.A. 179.  A reasonable finder of fact could conclude from this testimony that Investigator Armstrong's question specifically pertained to the controlled substances that Appellant purchased from Henry Schein.  Furthermore, a reasonable finder of fact could conclude that Appellant answered this question with a false statement.

b.

Appellant concedes that he falsely represented to Investigator Armstrong that he maintained a separate dispensing log for the recording of his administration of controlled substances.  He argues, however, that this statement cannot sustain a § 1001(a)(2)

33

conviction because he "took back" the claim within a minute of making it, before the statement could "impact or alter" the DEA's investigation. Appellant's Br. 51.

Title 18 U.S.C. § 1001(a)(2) prohibits "any materially false, fictitious, or fraudulent statement or representation." For purposes of this statute, a "materially false" statement is one that "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012). The United States was not required to prove that Appellant's "false statement actually influenced the [DEA]'s decision-making process." *Id.* It is therefore irrelevant that Appellant walked back his statement before it could impact the DEA's investigation.

E.

Sentence

Appellant's final claim is that his sentence is procedurally and substantively unreasonable. He asserts that the district court based its decision to impose an above-Guidelines sentence of 20 months of imprisonment on unfounded speculation about who ultimately used many of the controlled substances that Appellant purchased from Henry Schein, and whether those substances contributed to the opioid epidemic.

"We review all sentences -- whether inside, just outside, or significantly outside the Guidelines range" -- for abuse of discretion. *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017) (internal quotation marks omitted). We begin by ensuring that the district court did not commit any significant procedural errors. *See United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009). Such errors include "failing to calculate (or improperly

34

calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." *Id.* "If, and only if, we find the sentence" to be procedurally reasonable, we proceed to an assessment of its substantive reasonableness. *Id.* At this stage, we determine whether, under the "totality of the circumstances, including the extent of any variance from the Guidelines range," the district court abused its discretion in imposing the sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). When reviewing an above-Guidelines sentence, we are bound to "give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017). At the same time, however, we recognize that "inherent in the idea of 'discretion' is the notion that it may, on infrequent occasion, be abused." *Id.*

Appellant is correct that, at sentencing, the district court mentioned that many of the pills that he purchased from Henry Schein were unaccounted for. *See* J.A. 684 ("The facts would indicate that the majority of the drugs were not given to [Appellant]'s wife. I don't know where they are. There's no evidence to that."). However, these statements do not affect the procedural or substantive reasonableness of Appellant's sentence because they were irrelevant to the district court's sentencing decision. The court made explicitly clear that it did not consider "the number of opioid pills available to [Appellant]'s wife" for purposes of calculating Appellant's sentence. *Id.* at 681. Instead, it considered the number of pills given to Appellant's wife "only for purposes of checking the factual basis of one

35

of [his] arguments," that is, Appellant's argument that he committed a "crime of love" and only obtained the controlled substances so he could treat his sick wife. *Id.* Additionally, contrary to Appellant's contention, the district court never speculated as to whether the controlled substances fraudulently acquired by Appellant contributed to the opioid epidemic.

Appellant does not claim that the district court committed any other errors at the sentencing stage of his proceedings, and our review of the record does not reveal any. The sentence is procedurally reasonable, as the court properly calculated the advisory Guidelines range as a term of imprisonment of six to 12 months, expressly considered the factors set out in 18 U.S.C. § 3553(a), and explained that its decision to impose an above-Guidelines sentence of 20 months of imprisonment was based on the serious nature of the offenses, specifically the types and quantities "of the controlled substances obtained" and the "length of time over which the offenses occurred." J.A. 684. The sentence, including the eight-month upward variance from the Guidelines range, is also substantively reasonable, as it is justified by the § 3553(a) factors, particularly the need for a sentence to "reflect the seriousness of the offense" and "promote respect for the law."

## III.

For the reasons set forth herein, Appellant's convictions on Counts 1–20, 22–26, and 28–70, as well as the sentence imposed by the district court, are

*AFFIRMED*.

36

DIAZ, Circuit Judge, concurring in part and dissenting in part:

Dr. Frank Purpera submitted false statements on two purchase order forms so that he could acquire controlled substances from Henry Schein, Inc. He then lied to a federal investigator about his administration of, and recordkeeping for, those substances. For the reasons ably explained by the majority, I agree that we should affirm most of Purpera's convictions.

But I think the evidence is insufficient to support Purpera's convictions on Counts 1–6, 17–20, 28, 40–43, and 55. These counts arise from the first purchase order form and related addenda that Purpera submitted to Henry Schein,[1] and are among the counts alleging that Purpera fraudulently obtained controlled substances in violation of 21 U.S.C. § 843(a)(3).[2] Contrary to the government's assertions, the form in question contains but one false statement. And as to that statement, the record doesn't contain substantial evidence that Purpera's dishonesty was subjectively material to Henry Schein's decision to fill the order, or that it would have been objectively material to a reasonable drug distributor's decision to fill such an order. I would therefore reverse the convictions on those counts and remand for resentencing.

---

[1] Although Purpera didn't move for acquittal on the counts arising from the addenda, as explained *infra*, Purpera's arguments as to the counts arising from the first form necessarily apply to those arising from the addenda.

[2] Purpera obtained thousands of tablets of oxycodone, hydrocodone, testosterone, alprazolam, diazepam, and tramadol.

I.

Dr. Purpera had never purchased controlled substances from Henry Schein before the events leading up to his offenses. Henry Schein requires a new customer like Purpera to fill out a questionnaire form attached to the initial purchase order so that the company can comply with relevant federal and state regulations. When a medical provider later seeks to order controlled substances not listed on the original form, Henry Schein requires the provider to list the new drugs in an addendum. But because an addendum includes only basic information related to the new order (such as quantity and frequency of the drugs), Henry Schein refers back to the information in the customer's original questionnaire when deciding whether to ship controlled substances requested in an addendum.

Purpera submitted his first questionnaire form and order to Henry Schein on April 16, 2014 and later submitted two addenda supplementing that order. Counts 1–6, 28, and 40–43 represent the drugs fraudulently obtained through the April 2014 form, and Counts 17–20 and 55 represent those fraudulently obtained through the addenda.[3]

Each count charges Purpera with violating 21 U.S.C. § 843(a)(3), which makes it unlawful for any person to knowingly "acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge." The indictment alleges that Purpera made three false statements in the questionnaire forms: (1) that he was not ordering drugs for his personal use, (2) that he dispensed the drugs to his patients, and

---

[3] At Henry Schein's request, Purpera later submitted a second questionnaire form. The drugs obtained via that form, and a related addendum, support the remaining fraudulent acquisition counts against Purpera.

(3) that he did not use the drugs "in the treatment of his spouse or family or friends." J.A. 23.

The indictment doesn't allege that the addenda contained any falsehoods. But because Henry Schein consults the original form before deciding to fill an order from a related addendum, the counts arising from the addenda are based on the same alleged misrepresentations. Accordingly, I look to that first form to see if the statements described in the indictment were false when Purpera made them.[4]

First, Purpera's representation on the April 2014 form that he wasn't self-medicating was truthful. Purpera had answered "No" to the question, "Do you use any of the controlled drug items you order for your own personal use?" J.A. 311. At trial, the government contended that this answer was false because Purpera used the testosterone ordered from Henry Schein. But as the district court recognized, Purpera didn't order the testosterone until August 2014, months after he submitted the first form. Because Purpera's response to the question about self-medicating was true at the time, the district court acquitted Purpera of Count 21, which alleged his fraudulent acquisition of testosterone through the first form and related addenda.

Nor did Purpera lie on the April 2014 form about dispensing controlled substances to his patients. Purpera circled "1–10%" in response to the question, "Please circle the

---

[4] Henry Schein's instructional materials for its forms don't require a customer to update information contained in an original questionnaire form. In fact, they suggest the opposite, stating several times that the company would "request additional information" from the customer if necessary. J.A. 219–20.

approximate percentage of patients that are treated in your office with controlled substances daily." J.A. 223. The evidence at trial was that Purpera administered at least some of the drugs to Rebecca Mosig,[5] whom he married ten days after submitting the April 2014 form. Indeed, Purpera kept a patient file for Mosig, which included several prescriptions that he wrote her. The government has since conceded that Mosig may account for the 1–10% of patients treated with controlled substances in Purpera's office. Thus, Purpera's representation about treating patients can't support the counts arising from the first form and related addenda either.

This leaves one remaining alleged misrepresentation on the April 2014 form: Purpera's "No" answer to Question 15, which asked, "Do you use any of the controlled drug items you order to treat family members or friends?" J.A. 309–10. Because Purpera treated Mosig with such substances, this statement was undeniably false. But to be clear, Purpera's answer was false because Mosig was his friend (albeit a special one), not because she was part of Purpera's family (since they hadn't yet tied the knot).

This distinction matters, because not every lie violates 21 U.S.C. § 843(a)(3). As the majority explains, the false statement must also have been material to a drug distributor's decision to fill an order of controlled substances. Materiality can be analyzed under a subjective standard (i.e., whether the fraud caused the particular drug supplier

---

[5] Purpera claimed that he administered the "vast majority" of the controlled substances obtained from Henry Schein to his wife. J.A. 442. But as the district court noted, there's a significant discrepancy between the quantity of drugs Purpera ordered and the quantity he dispensed to Mosig.

involved—here, Henry Schein—to ship the drugs), or an objective standard (i.e., whether the fraud would have caused a reasonable drug supplier to ship the drugs). As the majority correctly notes, the precedent in this circuit suggests that "the correct test for materiality [in a criminal fraud case with a private victim] . . . is an objective one." [6] *United States v. Raza,* 876 F.3d 604, 621 (4th Cir. 2017). But because the majority spends some time discussing whether Henry Schein actually relied on Purpera's misrepresentation, I do as well. Here, Purpera's false statement simply was not material under either standard.

I begin, as the majority did, with subjective materiality. Shaun Abreu testified for Henry Schein that the answer to Question 15 on the April 2014 form was material because the company would "consult" and "adhere to" relevant state law on using controlled drugs to treat family and friends. J.A. 310. Critically, Virginia law prohibits physicians from prescribing controlled substances to family members, but it treats friends like any other patient. 18 Va. Admin. Code § 85-20-25. As a consequence, Abreu stated that Henry Schein wouldn't fill an order in Virginia for controlled substances if a doctor intended to use them to treat family members. *See* J.A. 310–11. But, said Abreu, the company would fill such an order in a state that permitted using controlled substances to treat family members. *See* J.A. 409–10. Abreu also explained that because Virginia law "didn't really

---

[6] Some of our sister circuits, however, appear to evaluate violations of 21 U.S.C. § 843(a)(3) under a subjective standard of materiality. *See, e.g., United States v. Callahan*, 801 F.3d 606, 622 (6th Cir. 2015); *United States v. Adade*, 547 F. App'x. 142, 146 (3d Cir. 2013); *United States v. Bass*, 490 F.2d 846, 857 n. 11 (5th Cir. 1974), *overruled on other grounds by United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984).

address friends," Henry Schein later removed that part of Question 15 from the form entirely. *See* J.A. 406.

Given Abreu's testimony and the particulars of Virginia law, a false answer to Question 15 on the April 2014 purchase order form couldn't have been the cause—"but for" or otherwise—of Henry Schein's decision to sell Purpera controlled substances to treat Mosig. Even if Purpera had answered truthfully, the company would have filled the order because doctors in Virginia aren't barred from treating friends. Henry Schein's decision to later remove the question further confirms that Purpera's false statement as to his use of controlled substances to treat his friend was immaterial to Henry Schein.

On objective materiality too, the majority's analysis falls short. There's simply no evidence that, in light of Virginia law, a reasonable drug distributor would have viewed as objectively material a doctor's truthful answer about the use of controlled substances to treat friends. While the majority suggests a reason (i.e., that friendship could indicate the absence of a bona fide practitioner-patient relationship), the majority's inability to cite to the record on this point is telling. Specifically, no testimony—lay or expert—speaks to what a reasonable distributor would have considered material with respect to the treatment of friends and why.

The record shows that a sensible drug company might well be concerned about the lack of a bona fide practitioner-patient relationship when a doctor purports to treat family members, because a doctor in Virginia is prohibited from prescribing controlled substances

42

to family members.[7]  But that concern is tenuous at best when it comes to friends, who (under Virginia law) are in the same position as any other patient.

In sum, Purpera lied in response to Question 15 in the April 2014 form with respect to his treatment of friends, but his misrepresentation wasn't material to his acquisition of any controlled substances.  And because there are no other falsehoods on the April 2014 form, Purpera couldn't have fraudulently acquired the controlled substances ordered in that first form and the related addenda.

*     *     *

For these reasons, I can't agree with my colleagues that the government offered substantial evidence to support Purpera's convictions on Counts 1–6, 17–20, 28, 40–43, and 55.  Because I would instead reverse those convictions and remand for resentencing, I am unable to join Part II.D.1 of the majority opinion.

---

[7] For this reason, among others, Purpera's convictions on the counts arising from his second form and the related addendum are sound.  By the time Purpera submitted the second form, Mosig was his wife, so his response "No" to the amended Question 15, which asked "Do you use any controlled substances to treat family members?" was false.  J.A. 346.  And given Virginia law, the answer was material (and reasonably so) to Henry Schein's decision to fill the order.